Filed 11/7/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| GABRIEL JOSEPH HERNANDEZ, | H052774 |
| Petitioner, | (Santa Clara Super. Ct. No. C2207294) |
| v. | |
| THE SUPERIOR COURT OF SANTA CLARA | |
| Respondent, | |
| THE PEOPLE, | |
| Real Party in Interest. | |

Petitioner Gabriel Joseph Hernandez was charged with illegal possession of ammunition (Pen. Code, § 30305, subd. (a)(1)),[1] with two alleged prior felony strikes, after police pulled over a car in which Hernandez was a passenger. Hernandez filed a motion under the California Racial Justice Act of 2020 (RJA) (Stats. 2020, ch. 317, § 1) claiming that the police stopped and searched the vehicle because of his race and/or ethnicity. The superior court denied Hernandez's motion for failure to state a prima facie violation under the RJA. Because we conclude Hernandez produced facts which, if true, establish there is a substantial likelihood that a violation of the RJA occurred (see

---

[1] Unspecified statutory references are to the Penal Code.

§ 745, subd. (h)(2)), we issue a peremptory writ of mandate and direct the trial court to hold an evidentiary hearing to consider Hernandez's motion.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual background[2]

Around 11:00 p.m. on June 12, 2022, San Jose Police Officer Matthew McCurdy conducted a traffic stop on a vehicle due to, as he wrote in his report, a non-functioning license plate light and illegally tinted windows. San Jose Police Officers Alvarez[3] and Jack Leglu arrived as "fill officers." Hernandez was in the front passenger seat of the vehicle and both he and the driver gave McCurdy their identification as requested. McCurdy asked the driver and Hernandez whether either of them were on parole or probation, which they denied. McCurdy ordered both men to exit the vehicle and asserted that because of the low lighting in the area as well as the fact that the men were wearing baggy clothing that concealed their waistbands, he wanted to pat search them. McCurdy searched the driver, while Leglu searched Hernandez and found a "narcotics pipe" in his pocket.

As he was searching Hernandez, Leglu began whistling and asked him, "We gonna find anything in the car bro? Cause we're gonna figure it out. You know what I'm talking about." McCurdy searched the vehicle and found a backpack within arm's reach of the passenger seat. McCurdy opened the backpack and discovered a 33-round 9mm magazine loaded with 26 rounds of ammunition, and one loose 9mm round. The backpack also contained medical paperwork with Hernandez's name and other personal information. When McCurdy conducted a records check, he learned that Hernandez had

---

[2] For background purposes only, we provide this factual summary taken from the materials submitted in connection with the petition for writ of mandate.

[3] Officer Alvarez's first name does not appear in the record.

two prior felony convictions in Santa Clara County and thus was prohibited from possessing ammunition.

As McCurdy was searching the vehicle, two Latino men, one of whom was carrying a bottle, walked past on the sidewalk. Leglu whistled at the men and said, "Hey, primo, no cerveza. Drop it." One of the men responded briefly, but only the word "cerveza" was intelligible on the recording. Leglu replied, "Here, give me that shit." It appears the two men were allowed to proceed after surrendering the bottle to Leglu.

### B. Procedural background

On June 15, 2022, the Santa Clara County District Attorney filed a complaint charging Hernandez with one count of possession of ammunition by a felon (§ 30305, subd. (a)(1)). The complaint further alleged that Hernandez had suffered two prior strike convictions. (§§ 667.5, subd. (c), 1192.7, subd. (c).)

On October 16, 2023, Hernandez filed a motion alleging a violation of the RJA and requesting an evidentiary hearing. In that motion, Hernandez argued that McCurdy and Leglu's actions when they detained, searched, and arrested him exhibited bias based on Hernandez's race, ethnicity, or national origin. Specifically, Hernandez claimed that: 1) the officers engaged in racial profiling by stopping the vehicle in which he was a passenger and inquiring if he was on probation or parole; 2) the officers engaged in racial profiling by searching Hernandez, using his "baggy clothes" as a pretext; 3) the officers used stereotypically Latinx language such as "homie" and "primo" with Hernandez; 4) the officers made assumptions about Hernandez's criminal history and level of criminal sophistication; and 5) one of the officers used a whistle associated with Sureño criminal street gangs while searching Hernandez and made a "regular whistle sound" toward the two Latino men who approached on the sidewalk. In support of his RJA motion, Hernandez submitted a 22-page declaration from Dr. James Taylor, a professor of political science at the University of San Francisco (Dr. Taylor declaration).

3

At the December 12, 2023 hearing on his motion, Hernandez argued that his prima facie showing was based on the: 1) the racial profiling in the pretextual vehicle stop; 2) McCurdy justifying the pat search of Hernandez based on his baggy clothing; 3) the racist and stereotypical language used by the officers, e.g., "homie" and "primo," during the encounter; 4) the officers' assumptions that Hernandez was a felon (by stating " 'homie's a felon fo sholly' ") and that it was appropriate to use this slang or vernacular during the encounter; and 5) the officer's use of a Sureño gang whistle. At the conclusion of the hearing, the trial court denied Hernandez's motion, concluding that he had not made a prima facie showing of a violation of the RJA. In explaining its decision, the trial court stated that Hernandez's claim that Leglu used a "Sureño … street gang whistle" was "conclusionary and speculative." Hernandez's counsel asked the trial court to address the other four aspects of the motion, but the trial court declared that it "has made its ruling [and] will not make any further ruling."

On February 9, 2024, Hernandez filed a petition for writ of mandate in this court challenging the trial court's denial of his motion. (*Hernandez v. Superior Court,* H051807.) On September 5, 2024, after obtaining preliminary opposition from the People, this court issued an alternative writ directing the trial court to vacate its December 12, 2023 order denying the motion, enter a new order granting reconsideration of Hernandez's motion, and provide a detailed ruling addressing all five claims of alleged bias under the RJA.

In response to this court's alternative writ, the trial court held a renewed hearing on Hernandez's motion on September 16, 2024. The trial court requested that the parties submit supplemental briefing addressing *Bonds v. Superior Court* (2024) 99 Cal.App.5th 821 (*Bonds*).

On October 9, 2024, the trial court, after addressing all five claims of alleged bias, denied Hernandez's motion for failing to make a prima facie showing. Because the trial

4

court had complied with the alternative writ in H051807, this court discharged the alternative writ and denied the petition as moot on October 28, 2024.

On December 6, 2024, Hernandez filed the instant petition, challenging the trial court's October 9, 2024 order denying the motion. After requesting preliminary opposition from the People, this court issued an order to show cause on March 19, 2025.

## II. DISCUSSION

### A. Standard of review

Before turning to the merits of the petition, we address the People's contention that we are to employ a mixed standard of review, specifically that we review the trial court's factual findings for abuse of discretion and its legal conclusions de novo, citing to *Young v. Superior Court* (2022) 79 Cal.App.5th 138 (*Young*) and *Bonds*, *supra*, 99 Cal.App.5th at p. 821.

*Young* addressed the "discovery provision of the Racial Justice Act, which allows a defendant, '[u]pon a showing of good cause,' to obtain evidence from the prosecution relevant to a potential violation of the Act. (§ 745, subd. (d).)" (*Young, supra,* 79 Cal.App.5th at p. 143.) The court did not address what standard of review applies to review of a trial court's decision to deny a motion for an evidentiary hearing for failing to make a prima facie showing. We are not reviewing a lower court's discovery order under the RJA, so *Young* is not applicable. *Bonds* is similarly inapposite because, in that case, the Court of Appeal addressed the trial court's denial of an RJA motion *after* an evidentiary hearing, not at the prima facie stage. (*Bonds*, *supra*, 99 Cal.App.5th at p. 826.)

We are not persuaded by the People's argument. We review de novo whether Hernandez made a prima facie showing of a violation of section 745, subdivision (a). (*People v. Howard* (2024) 104 Cal.App.5th 625, 650–651 (*Howard*).)

5

### B. Applicable law

#### 1. General legal principles

" 'The express purpose of the Racial Justice Act is "to eliminate racial bias from California's criminal justice system because racism in any form or amount, at any stage of a criminal trial, is intolerable [and] inimical to a fair criminal justice system … ." (Stats. 2020, ch. 317, § 2, subd. (i) [uncodified].)' (*Bonds v. Superior Court* (2024) 99 Cal.App.5th 821, 828 [318 Cal.Rptr.3d 226] (*Bonds*).) 'Whatever may be uncertain about the Racial Justice Act, there are a few things that are abundantly clear. Perhaps most obvious is that the Racial Justice Act was enacted to address much more than purposeful discrimination based on race. Indeed, the primary motivation for the legislation was the failure of the judicial system to afford meaningful relief to victims of unintentional but implicit bias.' (*Ibid.*)" (*Howard*, *supra*, 104 Cal.App.5th at p. 648.) "The very nature of such unintentional and unconscious bias does not lend itself to a simple, one size fits all analysis. … [F]erreting out the existence of implicit bias is a herculean task that involves careful consideration of a variety of types of evidence, often including data and statistics, in search of the probability that an actor was motivated by implicit bias. And although this clearly is an arduous task, it is not impossible. However, this type of inquiry requires a case by case approach based on the unique evidence offered." (*Jackson v. Superior Court* (2025) 109 Cal.App.5th 372, 385 (*Jackson*).)

In order to effectuate the goals of the RJA, section 745, subdivision (a)(1) provides: "(a) The state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin. A violation is established if the defendant proves, by a preponderance of the evidence, any of the following: [¶] (1) The judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin." If the defendant files a

motion pursuant to section 745 and makes a prima facie showing of a violation, the trial court is required to hold an evidentiary hearing. (§ 745, subd. (c).) The RJA defines "prima facie showing" to mean "the defendant produces facts that, if true, establish that there is a substantial likelihood that a violation of subdivision (a) occurred. For purposes of this section, a 'substantial likelihood' requires more than a mere possibility, but less than a standard of more likely than not." (§ 745, subd. (h)(2).)

Upon making a prima facie showing, the defendant has the burden at the evidentiary hearing of proving a violation by a preponderance of the evidence but does not need to prove intentional discrimination. (§ 745, subd. (c)(2).) The trial court is required to make its findings on the record. (§ 745, subd. (c)(3).) If the court finds a violation, the RJA requires the court to impose a remedy specific to the violation. (§ 745, subd. (e).)

In *Finley v. Superior Court* (2023) 95 Cal.App.5th 12, 20 (*Finley*), the court examined the question of the prima facie standard under the RJA, noting that it was then an issue of first impression. In the court's view, the prima facie standard applicable to habeas corpus petitions provided a useful starting point, but "[a]lthough … the type of information a defendant should present at the prima facie stage of a Racial Justice Act case is similar to the information a defendant should present in a habeas corpus petition, the standard by which a court assesses the information is somewhat different." (*Finley, supra*, at p. 22.) The standard in RJA cases is "not as stringent," because unlike in a habeas corpus proceeding, the "court does not ask if the defendant proffered facts sufficient to demonstrate actual entitlement to relief. Rather, the court asks if a defendant has proffered facts sufficient to show a 'substantial likelihood'—defined as 'more than a mere possibility, but less than a standard of more likely than not'—that the Racial Justice Act has been violated. (§ 745, subd. (h)(2).)" (*Finley,* at p.22) "The defining feature of the prima facie standard is that it creates an initial burden on a moving party to proffer

7

evidence that would support a favorable ruling without a court's consideration of conflicting evidence put forth by the opponent." (*Id*. at p. 21.)

To that end, "a defendant seeking relief under the Racial Justice Act must state fully and with particularity the facts on which relief is sought, and include copies of reasonably available documentary evidence supporting the claim. The court should accept the truth of the defendant's allegations, including expert evidence and statistics, unless the allegations are conclusory, unsupported by the evidence presented in support of the claim, or demonstrably contradicted by the court's own records. [Citation.] And again, the court should not make credibility determinations at the prima facie stage." (*Finley*, *supra*, 95 Cal.App.5th at pp. 22–23, fn. omitted; see also *Mosby v. Superior Court* (2024) 99 Cal.App.5th 106; *Jackson, supra,* 109 Cal.App.5th at p. 372.) At the prima facie stage, the trial court should focus on the accuracy and significance of defendant's proffered facts, rather than weighing them against contrary evidence. (*Finley*, *supra*, 95 Cal.App.5th at p. 24.)

### 2. Claims under the RJA should be reviewed in the totality of the proffered facts

Before examining Hernandez's allegations in support of his motion for relief, we briefly consider his argument that the trial court erred by failing to consider his "RJA claims collectively, based on the totality of the alleged circumstances." In support of this position, Hernandez cites *Young*, *supra*, 79 Cal.App.5th at p. 164, where the court stated that "evidence offered in support of a theory of violation under one part [of the RJA] [i.e., Penal Code § 745, subds. (a)(1)-(4)] may be corroborative of the evidence supporting another theory of violation under a different part [of the RJA]." In Hernandez's view, if "evidence *across subsections* of the RJA should be considered collectively, there is no doubt that evidence supporting a claim brought under *a single section* of the RJA should also be considered collectively."

8

The People counter that *Young* does not stand for the proposition that "five meritless claims can be added together to make a meritorious claim, but rather that the same evidence can support multiple theories of a violation." The People deny that the RJA requires that all of a movant's claims must be "analyzed in the aggregate, or that failure to do so undermines other conclusions" and point out that Hernandez offered no legal authority to support his position.

We are not persuaded that courts, when evaluating a motion alleging a violation of the RJA, should view the moving party's individual claims in isolation and not consider whether several discrete actions, in totality, would give rise to a violation. As another panel of this court has noted, "Arguably, section 745, subdivision (a)(1) might allow a defendant to establish a violation based on separate instances of conduct considered together; nothing in the plain language of that subdivision expressly rules out this possibility." (*People v. Wagstaff* (2025) 111 Cal.App.5th 1207, 1232.)

Furthermore, employing an approach which allows the trial court to consider the totality of the proffered facts, as opposed to the reductionist approach suggested by the People, would further promote the legislative purpose underlying the RJA, specifically its goal of addressing " 'the failure of the judicial system to afford meaningful relief to victims of unintentional but implicit bias.' [Citation.]" (*Howard*, *supra*, 104 Cal.App.5th at p. 648.) Consequently, courts should consider whether the claims, in the totality of the proffered facts, establish a violation of the RJA at the prima facie stage, even if one or more of those claims, taken in isolation, may not meet that threshold. However, once a trial court determines that the threshold has been met, singly or through some combination of claims, it must proceed to the evidentiary hearing.

### C. Analysis

As instructed by our alternative writ, the trial court vacated its prior order, held a further hearing, and obtained additional briefing on *Bonds* before issuing a written order

9

addressing each of the five claims. In that order, the trial court rejected each of Hernandez's claims as "conclusory" based on its parsing of certain aspects of Hernandez's showing in support of the motion. This was error. Based on our de novo review of Hernandez's claims and considering the totality of the proffered facts, we conclude Hernandez has made a prima facie showing sufficient to require an evidentiary hearing under the RJA.

### 1. Racial profiling in the vehicle stop

In his RJA motion, Hernandez's first allegation is that the police officers engaged in racial profiling when they stopped the vehicle in which he was a passenger, ostensibly due to a broken license plate light and illegally tinted windows. In support of his allegation, Hernandez submitted a declaration from an expert, Dr. Taylor, which stated that "Hernandez's stop, detention, and arrest appear to be based on the pretext of non-moving violations that frequently and disproportionately lead to police officer-minority driver contact in the County of Santa Clara, the city of San Jose, and the state of California." Dr. Taylor cited a study examining "all traffic stops conducted by San Jose police from July 1 to September 30, 1999" which found that "Latino drivers are stopped more frequently than any other ethnic group in the city and well out of proportion to their share of the population. They account for 31 percent of San Jose's residents, but made-up [*sic*] 43 percent of the drivers stopped by police." Dr. Taylor also noted that although the vehicle in which Hernandez was a passenger was pulled over for a non-functional license plate light and illegal window tinting, "[w]ithin seven seconds of the stop, officers fully abandoned the lawful basis of the stop over the subsequent 44 minutes." The officers made no "attempt to measure or establish the percentage of window Visual Light Transmission (VLT) tint shade, which is permissible in the state of California up to 70 percent."

10

In response, the People argue that the trial court properly rejected Dr. Taylor's citation to the 1999 study involving San Jose police traffic stops because "the study was so out of date." The People also point out that the trial court correctly noted that one source of data cited in the Dr. Taylor declaration, specifically the 2019 Racial Identity Profiling Act (RIPA), demonstrated that Latinos were *not* subjected to traffic stops disproportionate to their share of the population. Finally, the People argued that there was legal cause for the traffic stop in this case and that Hernandez had not presented facts to demonstrate that the stop was racially motivated.

"[I]n section 745, subdivision (c)(1), the Legislature has specifically provided that 'reliable, statistical evidence, and aggregated data are admissible for the limited purpose of determining whether a violation of subdivision (a) has occurred.' " (*Bonds*, *supra*, 99 Cal.App.5th at pp. 830–831.) "The principles that apply to a defendant's prima facie showing extend to expert declarations and statistical information that accompany a motion under the Racial Justice Act; a court should not accept the truth of this evidence if it is 'conclusory' and ' "made without any explanation." ' [Citation.]" (*Finley*, *supra*, 95 Cal.App.5th at p. 22.) "At the prima facie stage of a Racial Justice Act motion, … the trial court must consider whether the motion and its supporting evidence state facts that, '*if true*, establish that there is a substantial likelihood that a violation' occurred (§ 745, subd. (h)(2), italics added), and should not weigh the evidence or make credibility determinations, except in the rare case where the record 'irrefutably establishes' that a defendant's allegations are false. [Citation.]" (*Finley*, at pp. 23–24.)

The trial court determined that the expert's opinion that Hernandez was "subject to a pretext stop based on race is conclusory and not supported by the studies or research cited in the declaration." We disagree. The 1999 study of traffic stops carried out by San Jose police, and attested to by Dr. Taylor in his declaration, provides support for an inference that in conducting the traffic stop the officers exhibited bias towards Hernandez

11

because of his race, ethnicity, or national origin. The trial court questioned whether the findings from the 1999 study "remain valid" and could be applied to a "traffic stop occur[ing] in 2022, over two decades after the 1999 study" but there is nothing in the record to support the trial court's skepticism about the study's validity. Dr. Taylor's opinion as to the bias involved in the traffic stop is not "conclusory, unsupported by the evidence presented in support of the claim, or demonstrably contradicted by the court's own records" (*Finley*, *supra*, 95 Cal.App.5th at p. 23, fn. omitted) because it is based on a study that may or may not be out of date. At an evidentiary hearing, not the prima facie stage, the trial court can appropriately consider whether the passage of time has limited the value of such a study or rendered its data obsolete. Given that this evidence is not conclusory, without explanation, or contradicted by the court's own records, we must accept it as true at this stage of the proceedings.

The trial court also discounted Dr. Taylor's opinion on this allegation because the 2019 RIPA study data indicate, in the aggregate, "the share of traffic stops of Latinos is similar to their share of the population" and thus does not necessarily support Hernandez's claim of racial profiling. According to Dr. Taylor's declaration, however, the 2019 RIPA study "includes all traffic stops … reported by the 15 largest law enforcement agencies in the state[] [] includ[ing] California Highway Patrol (CHP), eight police departments (Los Angeles, San Diego, San Francisco, Sacramento, Fresno, San Jose, Long Beach, and Oakland), and six county sheriff's departments (Los Angeles, San Bernardino, Sacramento, San Diego, Riverside, and Orange County)." Without disaggregation, the 2019 RIPA study data neither supports nor disproves a conclusion that the *San Jose Police Department* is initiating traffic stops on Latinos (or other races) disproportionate to their share of the population.

The trial court also found "it seems quite unlikely that any of the officers had a sufficient view into the car to discern the race of the occupants, given that the car had

12

tinted windows (one of the reasons for the stop) and the stop happened late at night while it was dark outside." Further, the trial court asserted "there is no allegation that any of the officers knew the race of the driver or Hernandez (the passenger) *before* initiating the stop. Nor is there any allegation that the officers suspected or assumed, even unconsciously, the race of the car's occupants based on what they knew or could observe … ." However, our review of the record, including video evidence, does not support the trial court's conclusion that the officers could not see the occupants of the vehicle before initiating the stop.

While McCurdy lists illegal tinting as one reason why he pulled the vehicle over, he does not indicate whether he first observed the vehicle from the front, the side, or the rear, nor does he indicate which of the vehicle's windows were excessively tinted. His report states only that, as he "was traveling westbound on Alum Rock Avenue near its intersection with Sunset Avenue[,] [he] observed a vehicle … traveling westbound[,] [and] observed that the license plate light of the vehicle was not functioning and the vehicle had tinted windows in violation of [Vehicle Code sections] 24601[, subdivision] (a) [] and 26708[, subdivision] (a)." The fact that, after stopping the vehicle, McCurdy never sought to evaluate the windows' level of tinting but immediately shifted to questioning the occupants about their parole and probation status is consistent with a claim that the license plate light and window tinting were simply a pretext to pull over a vehicle occupied by two Latino men. Hernandez's contentions may or may not be borne out in an evidentiary hearing, but at the prima facie stage, as discussed above, we must employ a different lens.

### 2. Racial profiling in pat search

Hernandez's second claim is that the pat search was due to the officers' racial bias rather than because of his "baggy" clothing or the lighting in the area. In support of this contention, Hernandez cited *People* v. *Pantoja* (2022) 77 Cal.App.5th 483, 491 and an

article on National Public Radio's website, entitled *Sagging Pants and the Long History of Dangerous Street Fashion*.[4]

The People argue that Hernandez failed to provide evidentiary support for his assertion that the decision to pat search him was based on his race rather than the reasons listed by Officer McCurdy, namely that the stop took place late at night and both the driver and Hernandez wore baggy clothing that concealed their waistbands. In the People's view, the trial court properly determined that because Hernandez did not present evidence that " 'baggy clothing' was a proxy for race[,]" he failed to make a prima facie case under the RJA.

Again, we disagree with the trial court's conclusion that "there has been no showing beyond a conclusory allegation that 'baggy clothing' is generally a proxy for race or was used as one in this case." The NPR article cited by Hernandez addresses the relationship between race and "baggy" clothing, supporting a conclusion that there is a long history of the public in general and police in particular perceiving clothing and ethnicity as a strong indicator of criminality. This conclusion is further supported by the Dr. Taylor declaration where he states: "While roughly one in ten white drivers stopped by local law enforcement during [the late evening hours] are searched for contraband or evidence, about … one in five Latino drivers are searched. [¶] … Black and Latino drivers are overrepresented among no-enforcement/no-discovery stops that involve intrusive actions, including being asked to step out of the vehicle, being detained, being handcuffed, or an officer aiming or using a weapon." The Dr. Taylor declaration on this matter is not "conclusory, unsupported by the evidence presented in support of the claim,

[4] https://www.npr.org/sections/codeswitch/2014/09/11/347143588/sagging-pants-and-the-long-history-ofdangerous-street-fashion

14

or demonstrably contradicted by the court's own records." (*Finley*, *supra*, 95 Cal.App.5th at p. 23, fn. omitted.)

As discussed in *Bonds*, the RJA "was enacted to address much more than purposeful discrimination based on race. Indeed, the primary motivation for the legislation was the failure of the judicial system to afford meaningful relief to victims of unintentional but *implicit* bias." (*Bonds*, *supra*, 99 Cal.App.5th at p. 828.) Despite McCurdy's asserted reasons for conducting a pat search, i.e., lighting and baggy clothing, there remains the possibility "[t]hat the officer's actions were a product of an implicit bias that associated things the officer did know," including the clothing Hernandez was wearing, with his race. (*Id*. at p. 824.)

### 3. Officers' assumptions about criminal history and sophistication

Hernandez contends that the officers assumed, based on his race, that he was a felon, noting the officers' comments that " 'homie's a felon fo sholly' " and the statement " 'You got felony convictions, yeah? I'm pretty sure it's likely ….' " Hernandez relies on the body camera footage and the Dr. Taylor declaration to support this claim.

In response, the People argue that the body camera footage makes clear that the officers' comments regarding Hernandez's status as a felon came *after* he admitted to being a felon and thus could not have been motivated by racial bias. The trial court stated that its "review of the body-worn camera footage [] shows that the officers did not assume he was a felon[]" and, citing *Finley*, *supra*, 95 Cal.App.5th at p.23, the "footage demonstrably contradicts the allegation that the arresting officers assumed Hernandez was a felon based on his race."

In the footage of Leglu pat searching Hernandez, Leglu can be heard asking him, "We gonna find anything in the car bro? Cause we're gonna figure it out. *You know what I'm talking about*." (Italics added.) The final statement implies that Leglu had

15

decided he was dealing with someone who was personally familiar with criminal investigations.

Next, we turn to the body camera footage in which officers discussed prior felony convictions. In that footage, Hernandez can be seen handcuffed in the rear of a police car as McCurdy[5] adjusts and secures Hernandez's seat belt. An officer (Officer 1) can be heard saying, "He [Hernandez presumably] has a felony warrant for [unintelligible.]" Officer 2 then asks Officer 1, "he's got a felony *warrant*?" As Officer 1 says, "Yeah," Hernandez interjects, "I don't have a felony warrant, it's a misdemeanor warrant." Officer 1 says, "It's a felony warrant, bro [unintelligible] zero dollar bail, so …" Officer 2 says, "No, it's a [section] 488." Officer 1 then asks, "488?" and Officer 2 replies, "Yeah, it's a misdemeanor." Officer 1 asks, "How come it says [unintelligible]?" to which Officer 2 replies, "I don't know." Officer 2 then says, "They probably got it wrong" and "You're right, I think you're right." There is then another unintelligible statement from one of the officers before either Officer 1 or Officer 2 can be heard saying, "Homie's a felon fo sholly."

In conducting our de novo review, including our independent assessment of the relevant video footage, the word "conviction" is not audible at any point in this recording; instead, the officers and Hernandez discuss whether he had a felony or misdemeanor *warrant*. Simply stated, the available footage does not show Hernandez admitting that he had a felony *conviction*—though he did admit he had a misdemeanor warrant which one of the officers apparently confirms. Therefore, Hernandez's claim

---

[5] This footage was identified below as coming from McCurdy's body cam. Two officers can be heard speaking on the footage. Because Hernandez is the only person whose face and mouth is visible in the footage, it is not possible to positively identify which of the officers is speaking at any given time. We therefore refer to the two officers whose voices are audible on the footage as Officer 1 and Officer 2. If a transcript of this footage was prepared for use in the prima facie hearing, it is not part of the record in this proceeding.

that the officers assumed on the basis of his race that he was a felon ("Homie's a felon fo sholly") was not conclusory, unsupported by the evidence presented in support of the claim or demonstrably contradicted by the court's own records.

We further note that McCurdy does not mention in his report that Hernandez admitted to a felony conviction during their encounter. According to that report, Hernandez was placed in the patrol car, with his seatbelt fastened, before he was read his *Miranda* rights and questioned about the ammunition and the narcotics pipe. The report then indicates that McCurdy "conducted [a] statewide record check of Hernandez for prior felony convictions due to felons not being able to possess ammunition[] [which] revealed that Hernandez had two prior felony convictions out of Santa Clara County. (#208896) (C2007099)."

### 4. Officers' use of slang and ethnically stereotypical language

Hernandez asserts that the officers' use of terms such as "homie," "primo," "bro," and "fo sholly" reflected their racial or ethnic bias and belief that, because he was Latinx, he must be involved in criminal activity. In support of this contention, Hernandez cited the body camera footage which captured the language used by the officers during the encounter, as well as a 2017 study entitled *Language from Police Body Camera Footage Shows Racial Disparities in Officer Respect*.

In the return, the People argue that Hernandez's claim regarding the language used by the arresting officers was conclusory and unsupported by evidence, noting that the 2017 study referenced in his motion was never attached as an exhibit to his motion or linked for the trial court's reference.[6]

---

[6] We agree with the Attorney General that we may not consider the 2017 study cited by Hernandez as it was not provided to the trial court and is thus not part of the record. An appellate court must generally limit its review to matters that are included in the record from the proceedings below and may not consider other matters. (*Spaccia v. Superior Court* (2012) 209 Cal.App.4th 93, 96, fn. 2.)

17

Reviewing the body camera footage, as well as the Dr. Taylor declaration which asserts that these words demonstrate the officers' racial bias, we need not determine whether the terms "homie," "primo," "bro", etc., are sufficient alone, at the prima facie stage, to find a violation of the RJA. In conjunction with Hernandez's other claims, however, the officers' use of such language toward Hernandez and the two Latino men who walked past the scene certainly supports an implication the officers exhibited bias towards Hernandez because of his race, ethnicity, or national origin. Because we conclude that one or more of Hernandez's other claims, considered in the totality of the proffered facts, are sufficient to meet his burden at the prima facie stage, Hernandez will be allowed to set forth other evidence at the evidentiary hearing which might support this particular contention.

### 5. Officers' use of "Sureño whistle" during encounter

Hernandez claims that Officer Leglu's use of a "Sureño whistle" as the officer pat searched him and again as Leglu contacted the two Latino men walking on the sidewalk demonstrated Leglu's racial bias.[7] According to Hernandez, the whistle was only directed at Latinos and Leglu must have assumed that Hernandez must be involved in or familiar with criminal street gangs. In support of this claim, Hernandez offered the body camera footage, along with the Dr. Taylor declaration which opined that the whistle "may convey an ethnic specific meaning, with animus, … and might also convey intragroup ethnic or regional animosities." Dr. Taylor also asserted that the whistle may have been an attempt to intimidate the driver of the vehicle into giving consent to search.

---

[7] In the original RJA motion and the initial writ petition (*Hernandez v. Superior Court,* H051807), Hernandez described the second whistle, directed at the two pedestrians, as a "regular" whistle. In the instant writ, Hernandez now asserts that the officer directed the "Sureño whistle" both at Hernandez *and* at those pedestrians. This change in position is not material to our analysis, but we note it for the sake of accuracy.

18

In the return, the People contend that Hernandez provided no evidence to support the contention that the whistle was anything other than "race-neutral noise." In the People's view, the claim was conclusory, and the trial court did not err in rejecting it.

Our review of the body cam footage shows Leglu pat searching Hernandez. As Leglu does so, he emits a series of whistles, varying in pitch and length. Dr. Taylor described in his declaration how various gangs use different kinds of whistles and that Leglu's use of what Dr. Taylor called a Sureño whistle may have been an attempt to intimidate Hernandez. We need not decide at this stage if this particular whistle is a "Sureño whistle" as Hernandez, supported by the Dr. Taylor declaration, asserts or that such a whistle would suffice, in isolation, to meet the prima facie standard under the RJA and trigger Hernandez's right to an evidentiary hearing.[8] Given that Hernandez's other claims, considered together, have met that threshold, Hernandez may present evidence at the evidentiary hearing to support his claim that the whistle(s) demonstrated the officers exhibited bias towards Hernandez because of his race, ethnicity, or national origin.

### D. Conclusion

Upon conducting our de novo review, and considering Hernandez's claims, in the totality of the proffered facts, we conclude that Hernandez has made a prima facie showing that there is a substantial likelihood that a law enforcement officer involved in the case exhibited bias or animus towards the defendant because of race, ethnicity, or national origin. (§ 745, subd. (a)(1).) That is to say, he has set forth facts which demonstrate " 'more than a mere possibility, but less than a standard of more likely than

---

[8] As referenced above, we have reviewed the clips of the body camera footage that were submitted to the trial court, but it is possible that, at the evidentiary hearing, other footage from the encounter could be presented that provides additional context for these whistles or other referenced claims.

19

not'—that the Racial Justice Act has been violated. (§ 745, subd. (h)(2).)" (*Finley*, *supra*, 95 Cal.App.5th at p. 22.)

### III.    DISPOSITION

Let a peremptory writ of mandate issue directing the superior court to vacate its order denying Hernandez's motion for relief under the Racial Justice Act and to hold an evidentiary hearing under Penal Code section 745, subdivision (c).

_____
WILSON, J.

WE CONCUR:


_____
DANNER, ACTING P. J.


_____
BROMBERG, J.


*Hernandez v. Superior Court*
H052774

Trial Court:                              Santa Clara County
Superior Court No.: C2207294

Trial Judge:                             The Honorable Shella Deen

Attorneys for Petitioner              Brett Hammon
Gabriel Joseph Hernandez:             Molly Jane O'Neal
                                       Michael Aaron Mugmon
                                       Kelsey Mittman Quigley


Attorney for Respondent
The Superior Court of Santa Clara County:

The People                            Office of the Attorney General
Real Party in Interest:               Henry H. Kim
                                       Kaci Rebecca Lopez
                                       Marisa Ann McKeown
                                       Jordan Mark Kahler

*Hernandez v. Superior Court*
H052774